OPINION
{¶ 1} Defendant-appellant Kathleen Blaich appeals from her conviction and sentence for Grand Theft. She contends that the evidence does not support the conviction and that she was denied the effective assistance of counsel at trial. She further claims that she was denied a fair trial due to cumulative error.
 {¶ 2} We conclude that Blaich's conviction is not against the weight of the evidence and that her claim of ineffective assistance of counsel is not supported by the record. Further, we find no error, let alone cumulative error, that would support the claim that she was denied a fair trial. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 3} Moore's Fitness World (Moore's) is a company consisting of ten fitness centers, with its home office located in Montgomery County. It is owned and operated by Darlene and Joe Moore. Moore's employs regional directors who, as part of their duties, collect envelopes from each club on a regular basis. These envelopes contain "day sheets," consisting of information regarding sales and receipts at each club for a particular day. The day sheets are prepared by the employees at each of the separate fitness facilities. The envelopes also contain cash, checks, member receipts and credit card receipts for each club. The envelopes are sealed by the employees at the individual clubs.
 {¶ 4} Blaich was employed by Moore's Fitness World (Moore's) in May 2002. As part of her duties, Blaich was responsible for counting and depositing all monies collected at each of Moore's ten fitness clubs. Blaich would total the amount of cash and checks and enter that amount on an area of the day sheets titled "Section IV." Blaich would circle that amount, write the date by the amount and then initial them. Blaich would also prepare a deposit slip, as well as a document referred to as a "deposit breakdown sheet." This breakdown sheet was used to make separate notations of the amount of monies received from each of the respective fitness clubs. Blaich kept the items to be deposited at her desk until she made each deposit at the bank.
 {¶ 5} Normally, Stella Voorhees, an administrative assistant at Moore's, would subsequently check the day sheet totals and the bank totals to ensure that the amount of money received matched the amount deposited with the bank. However, due to a staffing shortage in 2002, Voorhees was unable to perform this duty on a regular basis. In November of 2002, Moore's resolved its staffing problem, and Voorhees was able to resume checking the receipts and deposits. On December 2, Voorhees noted discrepancies between the amounts noted on the breakdown sheets and the amounts circled on the day sheets by Blaich.
 {¶ 6} Voorhees called Darlene Moore and informed her of the findings. A few minutes later, Ms. Moore received a call from Ronald Byrd, a regional director, who informed her that Blaich had just approached him in order to tender her resignation. Byrd indicated that Blaich had stated that office staff was "conspiring to try to pin missing money on her," that he had refused her resignation, and that he told her to speak to Darlene or Joe Moore.
 {¶ 7} Ms. Moore returned to the home office and met with Blaich. Following that meeting, she scheduled a meeting the next day to discuss the situation. The following day, Blaich arrived at the home office. At that time, Joe Moore called the Montgomery County Sheriff's Department to report the missing money, which totaled over five thousand dollars. During the meeting attended by Joe Moore, Darlene Moore, Blaich and Voorhees, Deputy Sheriff Jay Wheeler entered the room. The Moores decided to press charges, and Blaich was transported to the Sheriff's Office.
 {¶ 8} Blaich was indicted on one count of Grand Theft, in violation of R.C. 2913.02(A)(2). Following trial, a jury found her guilty as charged. She was sentenced to community control sanctions. From her conviction and sentence, Blaich appeals.
 II {¶ 9} Blaich's First Assignment of Error states as follows:
 {¶ 10} "The appellant's conviction is not supported by sufficient evidence and is against the manifest weight of the evidence."
 {¶ 11} Blaich contends that the evidence in the record does not support her conviction for Grand Theft. In support, she points to the conflicts between her testimony and that of the State's witnesses and claims that her testimony is not contradicted and must be accepted.
 {¶ 12} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citation omitted. The trier of fact who sees and hears the witnesses is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," and thus we must show substantial deference to its determinations of credibility.State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 13} The evidence in this record consists of the trial testimony of Blaich, Voorhees, the Moores, Byrd and Wheeler. We have reviewed the entire transcript, as well as the documentary evidence introduced at trial.
 {¶ 14} According to Blaich, her duties with regard to the day sheets consisted of merely adding up the revenue amounts noted on the sheets by the club employees. She testified that upon opening the sealed envelopes, she would total the receipts entered on other sections of the day sheet by the particular club's employees, would then write the total on Section IV, and then would circle and initial that total. In other words, she testified that she merely tallied up the numbers written by other club employees and noted that amount on the sheet. She testified that she did not check that number against the monies contained in the envelopes.
 {¶ 15} Blaich testified that she would then staple the receipts and credit card slips to the day sheet and place them in Voorhees's office. Blaich testified that she would keep the cash and would count it after giving the day sheets to Voorhees. Therefore, she testified that she had no way of knowing whether the cash and checks she counted corresponded to the day sheets. She further testified that after counting the monies, she would fill in the deposit breakdown sheet and the bank deposit slips. She also testified that bank deposits were made daily. Blaich testified that others had access to the money while it was in her desk.
 {¶ 16} According to Blaich's testimony, when she arrived at work on December 2, 2002, Voorhees informed her that she had found discrepancies in the deposits. Blaich testified that she then made the following statement to Voorhees: "You couldn't have found any discrepancies because I didn't take any money."
 {¶ 17} Blaich testified that she then went to Byrd and informed him that she was resigning because she was "being accused of stealing money." Blaich testified that based upon Byrd's statements to her, she did not resign, but instead waited to meet with Darlene Moore. According to Blaich, during her meeting with Ms. Moore, the two women reviewed the day sheets and Blaich denied taking any money. Ms. Moore then set up a meeting for the next day.
 {¶ 18} At the meeting the following day, Blaich handed in her resignation. Blaich testified that she informed the Moores and Voorhees that she did not take any money from the company. Blaich testified that Deputy Wheeler walked in a few minutes later.
 {¶ 19} Blaich testified that she offered to pay the company fifteen hundred dollars, even though she did not take any money, because she believed that she would otherwise go to jail. Blaich testified that she did not take any money and did not tell anyone that she had taken any money.
 {¶ 20} According to Voorhees's testimony, she never informed Blaich that any monies were missing. She further testified that at the meeting on December 3, Blaich admitted taking the money as Deputy Wheeler entered the room. Voorhees also testified that the total amount taken was $5,839.09.
 {¶ 21} Darlene Moore testified that during their first meeting, Blaich at first denied taking any money. Ms. Moore testified that Blaich offered to pay Moore's $1,500 and that before the meeting ended, Blaich admitted to taking money. According to Ms. Moore, during the meeting the following day, Blaich again admitted taking money, but denied that she took $5,000. Ms. Moore also testified that Blaich made the admission in the presence of Deputy Wheeler.
 {¶ 22} Joe Moore's testimony corroborated that of Ms. Moore and Voorhees with regard to the meeting of December 3, 2002. Deputy Wheeler testified that when he arrived at the Moore's home office, Blaich stated that she "didn't take all that money," and that she admitted that she "might've taken a thousand"
 {¶ 23} From our review of the record, we find evidence to establish that Blaich was in charge of counting the receipts included with each day sheet and noting the amount of cash and checks brought in with each envelope. There is also evidence to support a finding that Blaich then counted the money to ensure that the amount contained in the envelope corresponded to the amounts set out on the day sheets. The evidence shows that Blaich was also in charge of preparing the deposit breakdown sheets and the bank deposit slips from her count of the money and review of the day sheets. The evidence further demonstrates that although it was her duty to do so, Blaich did not note any shortages in the amount of monies received in the envelopes as checked against the day sheets. There is evidence in the record that on numerous occasions during the period from September through November of 2002, the amounts Blaich noted on the deposit breakdown sheets were, in fact, at odds with the amounts she noted on the day sheets. There is evidence in the record to support a finding that the shortages ranged from as low as fifty cents to as high as two hundred and ten dollars.[1] The record also includes evidence from which a reasonable finder of fact could conclude that Blaich was the only person with access to the monies from the time she received the sealed envelopes to the time she made the bank deposits. The record shows that for each day on which a shortage was discovered, Blaich had initialed the day sheets, prepared the deposit slips and made the deposits. Finally, a reasonable finder of fact could credit the testimony of the Moores, Voorhees and Deputy Wheeler that Blaich made an admission that she had taken at least some of the money.
 {¶ 24} Obviously, Blaich's testimony is at odds with the testimony of the State's witnesses. Thus, it was the jury's duty to determine whose testimony was more credible. Upon review of the record, we cannot conclude that the jury "clearly lost its way" in concluding that Blaich knowingly, and without consent, obtained more than $5,000 from Moore's. We conclude that there is sufficient evidence in the record to support the jury's verdict, and that the verdict is not against the manifest weight of the evidence.
 {¶ 25} Accordingly, the first Assignment of Error is overruled.
 III {¶ 26} The Second Assignment of Error is as follows:
 {¶ 27} "Appellant's conviction must be reversed due to ineffective assistance of counsel."
 {¶ 28} Blaich contends that she was denied the effective assistance of counsel at trial. Specifically, she complains that counsel failed: (1) to make a Crim.R. 29 motion; (2) to file a motion to suppress, or even to raise an objection, with regard to the fact that Blaich requested an attorney; (3) to object to the introduction of the day sheets, deposit breakdown sheets and deposit slips; and (4) to object to the introduction of information regarding purchases made by Blaich.
 {¶ 29} In order to demonstrate ineffective assistance of counsel, Blaich must establish that her counsel's representation fell below an objective standard of reasonableness and that she has been prejudiced by counsel's deficient performance; i.e., that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Strickland v. Washington (1984), 466 U.S. 668. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of reasonable assistance. Id. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a reasonably debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id.
 {¶ 30} We first address trial counsel's failure to make a Crim.R. 29 motion. As noted in Part II, above, there is sufficient evidence in this record to permit a reasonable juror to find that Blaich committed the offense of Grand Theft. Therefore, a motion for a judgment of acquittal pursuant to Crim.R. 29, had it been made, would not have been well-taken, and the trial court would presumably have denied it.
 {¶ 31} Next, Blaich complains that counsel failed to file a motion to suppress any evidence that she had requested an attorney during her police interview. She contends that a motion to suppress would have prevented the prosecutor from purposefully eliciting such testimony. The testimony to which she refers is her own testimony upon cross-examination, during which the following exchange took place:
 {¶ 32} "Q: That's when you tell the detective, `No, I didn't take these monies and here's why. I don't know where they went, but I didn't take them.' That's what you told the detective, didn't you?
 {¶ 33} "A: No.
 {¶ 34} "Q: Why don't you tell these people what you told the detective?
 {¶ 35} "A: I told the detective that I didn't steal any money. And he told me to stop BSing with him. And that's when I asked for my attorney."
 {¶ 36} Counsel did not object to this testimony.
 {¶ 37} A review of the transcript reveals that during her direct examination, Blaich indicated that she never admitted to taking any money. During cross-examination, the prosecutor attempted to elicit from Blaich her assertion that the Moores, Voorhees and Deputy Wheeler were all lying when they testified that she had confessed to taking money. It is clear from reading the transcript that the prosecutor was not seeking to elicit any information regarding Blaich's request for an attorney. Indeed, given the context of the cross-examination at that point, Blaich's reference to having asked for her attorney, which was voluntary and unsolicited, was neither necessary to answer, nor suggested by, the prosecutor's question. Furthermore, this is the only reference in the entire record to the request for her attorney. The prosecutor did not ask Deputy Wheeler any questions during the State's case regarding any statements made by Blaich while at the Sheriff's Office. Nor did the prosecutor refer in closing argument to Blaich's having asked for her attorney while being questioned at the Sheriff's Office.
 {¶ 38} This is an issue of pure hindsight. There is no indication from this record that Blaich's request for an attorney was an issue that either the prosecutor or defense counsel intended to bring to the jury's attention. If fact, there is no mention of it during the State's entire case-in-chief; the only mention was due to Blaich's voluntary statement. In short, there is no indication from this record that a motion to suppress was necessary as it is evident that neither party had any intent to inject this issue into the trial.
 {¶ 39} Furthermore, we cannot say that defense counsel was deficient for failing to have objected. An objection would have made the matter more prominent in the jurors' minds. Moreover, since Blaich volunteered the information without prompting from the prosecutor, we cannot say that an objection was warranted. Finally, even if counsel was ineffective in this regard, we cannot say that an objection or even an admonishment by the trial court would have altered the outcome of this case. This was not a situation where a person being questioned by police, at the outset of questioning, and before it has become clear that official suspicion has centered upon her, blurts out a request to speak to an attorney. A reasonable juror would likely think it unremarkable that someone in Blaich's position, who is being questioned by police about an accusation that she has stolen a significant sum of money from her employer, would want to speak with an attorney, even if she knew herself to be entirely innocent of the accusation.
 {¶ 40} Next, Blaich contends that the day sheets, deposit breakdown sheets and bank deposit slips constituted inadmissible hearsay and that counsel was deficient for failing to object to their introduction. The State argues that the records are admissible under the business records exception to the hearsay rule.
 {¶ 41} Evid.R. 803(6) provides that the following are admissible as business records: "A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness * * * unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness. * * *"
 {¶ 42} First, it must be noted that contrary to Blaich's contention, Voorhees was not the only person to testify regarding these documents. Blaich testified that she generated the deposit slips and the deposit breakdown sheets in issue. She also testified regarding how those sheets were produced, and she testified that the sheets were produced in the regular course of business. Further, she provided testimony regarding the production of the day sheets and the fact that the information on the day sheets relevant to this case was generated as a result of her job duties. Indeed, Blaich's own testimony served to authenticate these documents. Finally, there is no showing that these documents were not trustworthy.
 {¶ 43} We also note that part of Blaich's trial strategy was to use these documents to help corroborate her testimony that she merely tallied the sums on the day sheets and that she did not check that the money in the envelopes matched the sums noted on the sheets. Additionally, it must be noted that the day sheets were also admissible for the non-hearsay purpose of showing that Blaich saw the sheets and that she took actions based upon the information contained on those sheets. Therefore, we cannot say that trial counsel was ineffective for failing to object to these exhibits.
 {¶ 44} Finally, Blaich contends that counsel was ineffective for failing to object to the admission of receipts showing lay-away purchases she made during November of 2002 at a K-Mart in Eaton, Ohio, and at a furniture store in Indiana. She argues that this evidence also constituted inadmissible hearsay.
 {¶ 45} Again, we note that part of Blaich's trial strategy was to use these documents to her advantage. Counsel tried to show that Blaich made payments on her lay-away purchases every two weeks. This was relevant because Blaich was paid by Moore's every two weeks. Counsel attempted to show the jury that had Blaich stolen the monies from Moore, she would not have needed to make a lay-away purchase because she would have had enough money to pay for the purchases outright. We conclude that this was reasonable trial strategy.
 {¶ 46} The Second Assignment of Error is overruled.
 IV {¶ 47} Blaich's Third Assignment of Error is as follows:
 {¶ 48} "Cumulative errors deprived the appellant of a fair trial."
 {¶ 49} In her final Assignment of Error, Blaich contends that the cumulative effect of the errors alleged herein resulted in an unfair trial.
 {¶ 50} "Separately harmless errors my violate a defendant's right to a fair trial when the errors are considered together."State v. Harris, Montgomery App. No. 19796, 2004-Ohio-3570, ¶ 40, citation omitted. For a reviewing court to find cumulative error, it must first find that multiple errors were committed. Id.
 {¶ 51} Given that we have found no errors committed, perforce we find no cumulative errors requiring reversal.
 {¶ 52} The Third Assignment of Error is overruled.
 V {¶ 53} All of Blaich's Assignments of Error having been overruled, the judgment of the trial court is affirmed.
Judgment affirmed.
Brogan and Wolff, JJ., concur.
[1] Contrary to Blaich's testimony that the discrepancies in amount ranged from seventy cents to fifty dollars, we note that there are approximately twenty instances where the discrepancy was one hundred dollars or more. Additionally, there were only three instances where the discrepancy amounted to less than one dollar. The majority of the instances involved amounts exceeding fifty dollars.